**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LEIGH HOLLAND** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY** | § | **CIVIL ACTION NO.: 3:23-cv-00037-S** |
| | § | |
| | § | |
| ***Defendant.*** | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff, Leigh Holland ("Holland" or "Plaintiff"), by counsel, complaining of Defendant, Texas Christian University ("TCU" or "Defendant") and in support thereof respectfully shows the Court as follows:

## I.

## INTRODUCTION

1.01 Defendant wrongfully fired Plaintiff from her job in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. 2601, *et seq*. (the "FMLA").

## II.

## THE PARTIES

2.01 Plaintiff is an individual who is a citizen of the State of Texas. Plaintiff can be contacted in care of her undersigned counsel.

2.02 Defendant Texas Christian University is a domestic non-profit corporation with its principal address at 301 N. Washington Avenue, c/o TCU Tax Services, Dallas, TX 75246-1754. Defendant Texas Christian University can be served through its registered agent, Victor J. Boschini, Jr., 3101 Bellaire Drive North, Suite 3200, Fort Worth, TX 76129 .

## III.

## JURISDICTION AND VENUE

3.01 Pursuant to 28 U.S.C. 1331, jurisdiction lies in the United States District Court for the Northern District of Texas, as this action involves a question of the application of federal law, including the Family and Medical Leave Act of 1993 (the "FMLA").

3.02 Venue for Plaintiff's cause of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. 1391.

## IV.

## FACTUAL ALLEGATIONS

4.01 Plaintiff began her career with Texas Christian University on July 15, 2002 as an Admissions Coordinator to oversee the admissions program along with the Microsoft testing (MOUS), hourly at 36 hours per week with a compensation of $28,000 annually. The position was brand new, which was due to the calculation of business students that would apply in the upcoming year. Because there were more than 300 plus students wanting to apply to the business school, they implemented an admissions program. Plaintiff's direct supervisor was Randy Lewis who gave Plaintiff the autonomy to run the program without supervision. The duties included, but were not

limited to processing applications, preparing and sending letters, working with alumni to be a part of Interview Day, proctoring the MOUS exams and maintaining the budget.

4.02 As time went on, Plaintiff transitioned into a new role within Student Affairs. Here, Plaintiff served as the Administrative Assistant for the Assistant Vice Chancellor of Student Affairs, Dr. Darron Turner. Dr. Turner's mentorship and guidance became instrumental in Plaintiff’s professional growth, and she flourished under his leadership. Dr. Turner was a firm believer in enhancing his employee’s skills and abilities, therefore allowing them to participate in training opportunities.

4.03 During Plaintiff’s tenure within Student Affairs, she began to take on new challenges and responsibilities while still reporting to Dr. Turner. Plaintiff moved from the Administrative Assistant into the Executive Assistant role. This role gave Plaintiff more budget responsibilities and allowed Plaintiff to become more familiar with Board of Director reports, Title IX reports, SACS reports and the creation of policies and procedures of the office. As Dr. Turner’s responsibilities increased working with EEO and Affirmative Action, so did Plaintiff’s responsibilities. These responsibilities moved Plaintiff from the job of Executive Assistant to the role of EEO/AA Program Specialist. While there was not a monetary increase outside of the 3%, in this role Plaintiff had the opportunity to increase her knowledge in fair processing in hiring practices across the university for faculty and staff.

4.04 In 2011, the federal law produced the Dear Colleague Letter, which caused major changes to federal contractors. Dr. Turner became the Title IX Coordinator in addition to his role as the Assistant Vice Chancellor of Student Affairs. These changes afforded Plaintiff the opportunity to move from the EEO/AA Program Specialist role to the Title IX and Compliance Specialist. Again, Plaintiff did not get a monetary increase, just a title change; but the experience

was a great reward. This role came with a plethora of duties, such as prevision of policy, investigation Title VI and Title VII cases, training university faculty and staff on Title IX policies and procedures, just to name a few. Plaintiff's commitment to the work and the university never wavered, and she became an indispensable member of the team despite the lawsuits, demand letters and other issues that came with the positions. Due to the demand of Title IX and the caseload, in 2018 the office moved under the Chancellors umbrella with a new team, promotion and title changes. These changes consisted of Dr. Turner, Title IX Coordinator and Senior Advisor to the Chancellor, Plaintiff, Leigh Holland Title IX Investigator, Andrea McDew, Deputy Title IX Investigator, Cheryl Taylor, Title IX and Compliance Specialist, Aisha Torrey-Sawyer, Director of Diversity and Inclusion and Sharon Gooding, Coordinator of Diversity and Inclusion.

4.05 In 2020, Dr. Turner and Plaintiff along with several other university members were named in a discrimination lawsuit. Due to the stress of the lawsuit, in August of 2020, Dr. Turner retired, which caused a restructuring of the office, name change, and the appointment of a new director. Under the new name, Office of Institutional Equity (OIE), it inherited Title VI and Title VII from Human Resources while still serving all Title IX cases for Faculty, Staff and Students.

4.06 Under this new structure, Sharon Gooding became the Director of the Office of Institutional Equity. Andrea McDew assumed the role of Title IX Coordinator and became Plaintiff's direct supervisor. Cheryl Taylor had a dual role of Title IX and compliance Specialist and Investigator to further develop her skills, but over time she could not handle both roles and the Investigator role and title was changed to Civil Rights and Title IX Case Manager. Within OIE, Plaintiff's title was changed to OIE Investigator with no additional monetary increase. Just as a side note, Plaintiff trained Andrea McDew (Plaintiff's direct supervisor) and Cheryl Taylor (Case manager) on the processes and procedures of the office before the reorganization.

4.07 The cases were minimal before the restructuring of the OIE office. Once the change, they began to see a case increase due to the shifting of Title VI and Title VII complaints to the OIE office. From August 2020 to March 2021, Plaintiff was the only named investigator in the office. Andrea, Sharon and Cheryl would investigate some cases, but by title and job description, Plaintiff was the only one. In mid-April of 2021, a new hire came aboard Teri Green as an investigator. Until Teri finished training and learning the Title IX regulations, Plaintiff's assigned caseload remained heavy.

**Investigations**

4.08 Jane Doe discrimination case, which Plaintiff investigated and completed in 12/2019, became a lawsuit that Plaintiff was named in. This suit started out with one person and multiplied into 5 Jane Doe's. This suit lingered into 2021. As Plaintiff gathered material, spoke to lawyers, prepared for possible depositions, Plaintiff continued to work on other complicated cases. (Note, TCU settled this case)

4.09 In July of 2021, an investigation of wrongful termination was on Plaintiff's docket and Plaintiff had to interview high up administrators while maintaining her composure of wrongful actions, such as harsh emails and phone calls from the respondents, who were Plaintiff's colleagues at the time. (Note, TCU settled this case also)

4.10 December 2021 another discrimination case landed on Plaintiff's docket. This case was particularly difficult for Plaintiff as an African American woman, considering the historical context of slavery and cotton picking. Plaintiff had to suppress her feelings of discrimination and listen to numerous justifications for the action of secret Santa gifting a two-foot cotton plant, complete with roots, moss, and dirt, from a Caucasian colleague to an African American colleague. Plaintiff also had to hold several meetings with Human Resource staff, who were Caucasian, to

put the respondent on administrative leave in support of the African American woman who worked in the same space as the respondent. This case became a significant strain on Plaintiff's mental health, especially with the traumatic comments and questions from the administration, such as questioning if the gift really caused harm, whether the respondent should only receive a warning, verses termination and the impact of dissemination of work to the African American colleague if the respondent was on leave. These responses felt like attempts to justify the actions of the white colleague, adding to the emotional burden of the situation.

4.11 After the completion of this case in April 2022, Plaintiff had to have surgery on her wrist, which she put off because she was in the middle of this investigation. Plaintiff's surgery and first FMLA leave was in May 2022. While on FMLA, Plaintiff began to see her therapist to help her with the depression and mental trauma. Plaintiff returned to work in July of 2022.

4.12 August 2022 another case Plaintiff investigated (discrimination based on gender) became a lawsuit. Although Plaintiff was not named in this one, Plaintiff played an intricate part in gathering information and speaking to outside counsel about Plaintiff's investigation process, information Plaintiff collected and any biases Plaintiff may or may not have. Plaintiff was still going to therapy while trying to maintain her workload of mental debilitating cases with no form of outlet or detoxing of information. (TCU settled this case as well).

4.13 In December 2022, a former student who used to visit Plaintiff's old office sent a demand letter to the Chancellor of the University and copied Plaintiff. The nature of the email was concerning enough that TCU police stationed an armed officer at the front door of the building to protect the Chancellor. Given Plaintiff's history with this student and Plaintiff's involvement in his discrimination complaint, Plaintiff became worried about her safety. Plaintiff raised her concerns with Sharon Gooding, the Director of OIE, but unfortunately, no action was taken.

Plaintiff requested an officer for her end of the building, but the Chancellor's stance was firm: “we do not lock building doors”, and no additional officer was assigned. The statement in the letter “May God have mercy on TCU” left Plaintiff traumatized and led Plaintiff to continue therapy sessions for a confidential outlet. Over the Christmas break, the student vandalized the building, prompting the SWAT team, bomb squad, and local police to arrive and eventually detain him.

4.14 In January 2023 after arriving back from the holiday break, the first case on Plaintiff’s docket was a case of sexual assault where the complainant lured the respondent in the basement and threatened to kill him with a hatchet. This case was intense and facilitated multiple reports, interviews, social media documents and Plaintiff’s accessibility to the complainant, her witness and the respondent.

4.15 Plaintiff spoke to Sharon Gooding on February 16, 2023 about her mental state and informed Ms. Gooding that she would be seeing her therapist on Friday. She stated, “Do what you need do to for your self-care.” Plaintiff expressed the influx of cases and the impossibility to take time off; she again said, “We have to take care of ourselves and I am here for you if you need anything.”

4.16 On Friday, February 17, 2023, Plaintiff met virtually with her therapist and Plaintiff broke down in her session. He advised Plaintiff to take the rest of the day off and provided Plaintiff with a doctor’s note to give to her supervisor. Andrea McDew was still on maternity leave so Plaintiff slid the note under Sharon Gooding’s door and left for the day.

4.17 On February 20, 2023, Plaintiff met with her therapist again and he advised Plaintiff to take some extended time off to get her mental health under control.

4.18 On February 21, 2023, Plaintiff was officially on FMLA through May 2, 2023. Upon Plaintiff’s return she was directed by Joan Fralia (Yohana Chambers assistant), to meet in

Human Resources at 9am. When Plaintiff got there, she became aware that this meeting was a separation meeting. At the time of Plaintiff's termination her compensation was $82,751.04 annually.

## V.

## FIRST COUNT

### FAMILY AND MEDICAL LEAVE ACT (FMLA) DISCRIMINATION, INTERFERENCE AND RETALIATION

5.01 The foregoing paragraphs in this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

5.02 Plaintiff was an eligible employee under the FMLA. Plaintiff had worked for Defendant for at least twelve (12) months and had worked at least 1,250 hours during the twelve (12) months prior to taking the leave.

5.03 Defendant was subject to the provisions of the FMLA. Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site for twenty (20) or more work weeks in the prior or current calendar year.

5.04 At the time of the discharge, Plaintiff had suffered from one or more "serious health conditions" as defined by the FMLA. 29 U.S.C. 2611 (11). In particular, Plaintiff was suffering with severe depression. This was also a "serious health condition" because it resulted in a period of incapacity of over three days, which required treatment by physicians and prescription medications. Plaintiff is under the continuing care of her physicians for treatment for this condition.

5.05 Defendant interfered with Plaintiff in the exercise of her FMLA rights by terminating her employment immediately after her return from FMLA leave. Plaintiff made good

faith efforts to submit all respective medical certifications for her FMLA leave.

5.06 The FMLA's interference provision makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," any substantive FMLA right. 29 U.S.C. § 2615(a)(1); *see also Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Notably, a claim that an employee was terminated for taking FMLA leave is cognizable under *both* an interference or prescriptive claim under 29 U.S.C. §2615(a)(1), or under a retaliation or proscriptive claim under §2615(2). *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 n.2 (6th Cir. Ohio 2007).

5.07 As a result of her wrongful termination, Plaintiff has suffered damages in the form of lost wages and benefits. Plaintiff is entitled to back pay, plus interest on that amount, to compensate her for that loss. 29 U.S.C § 2617(a)(1)(A)(i)-(ii). Plaintiff is also entitled to front pay, for which Plaintiff sues.

5.08 The aforementioned acts were and are a willful violation of the FMLA, and entitle Plaintiff to recover damages as provided by 29 U.S.C. 2617, including liquidated damages. Plaintiff further seeks reinstatement to her position or a comparable position with reinstatement of benefits and seniority time.

5.09 As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief. 29 U.S.C § 2617(a)(3).

## VI.

## JURY TRIAL DEMANDED

6.01 PLAINTIFF DEMANDS A TRIAL BY JURY.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant:

1) Judgment against Defendant for actual damages, including lost wages and benefits (both back pay and front pay), and damage to earnings capacity, the sum to be determined at time of trial;
2) Liquidated damages and additional damages as allowed by law;
3) Reinstatement;
4) The costs and expenses incurred by Plaintiff in seeking new employment;
5) An order that Defendant take such other and further actions as may be necessary to redress Defendant's violation of the FMLA;
6) Prejudgment and postjudgment interest at the maximum legal rate;
7) Attorneys' fees;
8) Experts' fees;
9) All costs of court; including attorney's fees; and
10) Such other and further relief to which Plaintiff may be justly entitled.

Dated: March 28, 2024

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: W. D. Masterson

W.D. Masterson
State Bar No. 13184000
wdm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
Telephone: 214/969-9099
Telecopier: 214/953-0133
**ATTORNEYS FOR THE PLAINTIFF**
**LEIGH HOLLAND**