**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LEIGH HOLLAND** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY** | § | **CIVIL ACTION NO.: 4:24-cv-00289-O** |
| | § | |
| | § | |
| ***Defendant.*** | § | |

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BRIEF

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: *W. D. Masterson*

W. D. Masterson
SBN 13184000
wdm@kilgorelaw.com
**Kilgore & Kilgore, PLLC**
3141 Hood Street, Suite 500
Dallas, TX 75219
214-969-9099 – Telephone
214-953-0133 – Fax

**ATTORNEYS FOR CLAIMANT**
**LEIGH HOLLAND**

# TABLE OF CONTENTS

**PAGE**


TABLE OF CONTENTS .......... ii

LIST OF EXHIBITS .......... iii

TABLE OF AUTHORITIES .......... iv

I. INTRODUCTION .......... 1

II. SUMMARY JUDGMENT EVIDENCE .......... 3

III. BACKGROUND FACTS .......... 4

IV. LEGAL STANDARD .......... 9

V. ARGUMENT AND AUTHORITIES .......... 10

A. LEGAL AUTHORITIES .......... 10

B. DEFENDANT'S ACTS OF FMLA DISCRIMINATION, INTERFERENCE AND RETALIATION .......... 11

C. FMLA VIOLATIONS TIMELINE AND ARGUMENT .......... 12

D. PLAINTIFF'S DAMAGES .......... 13

VI. PRAYER .......... 14

CERTIFICATE OF SERVICE .......... 15

## LIST OF EXHIBITS

| Exhibit No. | Description | Page No. |
|---|---|---|
| 1. | Unum Approval for FMLA leave from February 17, 2023 – May 1, 2023 | PApp 3-10 |
| 2. | Emails from Plaintiff's supervisor, Sharon Gooding dated March 2, 2023, and February 28, 2023, and Plaintiff's responses dated February 27, 2023, and March 1, 2023. | PApp 11-13 |
| 3. | Unum document stating that as of April 30, 2023, Plaintiff still had 1.8500 weeks of FMLA remaining. | PApp 14-15 |
| 4. | Dallas College paystub and 2023 W-2 from Navarro College | PApp 16-17 |
| 5. | Plaintiff's resume | PApp 19-21 |
| 6. | Letter from TCU stating Plaintiff's salary starting June 1, 2023. | PApp 22-23 |
| 7. | Plaintiff's Declaration | PApp 24-30 |
| 8. | FMLA Statute | PApp 31-63 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....8

*Haley v. Alliance Compressor LLC*,
391 F.3d 644 (5th Cir. 2004)....9

*Kauffman v. Fed. Express Corp.*,
426 F.3d 880 (7th Cir. 2005)....9

*Leonard v. Dixie Well Serv. & Supply, Inc.*,
828 F.2d 291 (5th Cir. 1987)....8

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
475 U.S. 574 (1986)....8

*Wysong v. Dow Chem. Co.*,
503 F.3d 441 (6th Cir. Ohio 2007)....9

**Statutes**

29 U.S.C. 2611 (11)....9

29 U.S.C. 2617....10

29 U.S.C. § 2615(a)(1)....9

29 U.S.C § 2617(a)(1)(A)(i)-(ii)....10

29 U.S.C § 2617(a)(3)....10

FMLA.... *passim*

FMLA Section 105....10

FMLA section 825.220....10

**Other Authorities**

Fed. R. Civ. P. 56....8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LEIGH HOLLAND** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY** | § | **CIVIL ACTION NO.: 4:24-cv-00289-O** |
| | § | |
| | § | |
| ***Defendant.*** | § | |

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BRIEF

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff Leigh Holland ("Plaintiff") and files this Motion for Summary Judgment against Defendant Texas Christian University ("Defendant" or "TCU"), and in support thereof respectfully shows the Court as follows:

## I.

## INTRODUCTION

1.01 As this Court is well aware the FMLA statute (attached as **Exhibit 8**, PApp 31-63 hereto) provides for strict liability for violations, which include discrimination, interference and retaliation. Plaintiff's position at the time of her termination was Office of Institutional Equity ("OIE") Investigator investigating Title VI and Title VII complaints to the OIE.

1.02 Plaintiff handled investigation of several cases involving serious emotional issues.

1.03 In January 2023 after arriving back from the holiday break, the first case on

Plaintiff's docket was a case of sexual assault where the complainant lured the respondent to the basement and threatened to kill him with a hatchet. This case was intense and facilitated multiple reports, interviews, social media documents and Plaintiff's accessibility to the complainant, her witness and the respondent.

1.04 Plaintiff spoke to Sharon Gooding on February 16, 2023, about her mental state and informed Ms. Gooding that she would be seeing her therapist on Friday. She stated, "Do what you need to do for your self-care." Plaintiff reminded Ms. Gooding of the influx of cases and the impossibility to take time off; she again said, "We have to take care of ourselves, and I am here for you if you need anything."

1.05 On Friday, February 17, 2023, Plaintiff met virtually with her therapist and Plaintiff broke down in her session. He advised Plaintiff to take the rest of the day off and provided Plaintiff with a doctor's note to give to her supervisor. Andrea McDew was still on maternity leave so Plaintiff slid the note under Sharon Gooding's door and left for the day.

1.06 On February 20, 2023, Plaintiff met with her therapist again and he advised Plaintiff to take some extended time off to get her mental health under control.

1.07 On February 21, 2023, Plaintiff was officially on FMLA through May 2, 2023. Upon Plaintiff's return she was directed by Joan Fralia (Yohana Chambers assistant), to meet in Human Resources at 9am. When Plaintiff got there, she became aware that this meeting was a separation meeting. At the time of Plaintiff's termination her compensation was $82,751.04 annually.

1.08 As soon as Plaintiff started her FMLA leave Defendant began interfering with Plaintiff's FMLA leave as follows:

1. Sharon Gooding, Defendant's Director of OIE, on February 28, 2023,

assigned work to Plaintiff to be done while Plaintiff was on leave. See **Exhibit 2**, PApp 11-13.

2. Defendant told Plaintiff that Plaintiff's FMLA leave expired on May 2, 2023, but Plaintiff later discovered that on April 30, 2023, Plaintiff still had 1.8500 weeks of FMLA leave. See **Exhibit 3**, PApp 14-15, in which UNUM, the FMLA administrator, advised Plaintiff that on April 30, 2023, Plaintiff still had 1.85 weeks of unused FMLA leave.

## SUMMARY JUDGMENT EVIDENCE

2.01 To support the facts in this motion, Plaintiff offers the following summary judgment evidence attached to this motion and incorporates the evidence into this motion by reference.

**1.** Unum Approval for FMLA leave from February 17, 2023 – May 1, 2023

**2.** Emails from Plaintiff's supervisor, Sharon Gooding dated March 2, 2023, and February 28, 2023.

**3.** Document stating that as of April 30, 2023, Plaintiff had 1.8500 weeks of FMLA remaining.

**4.** Dallas College paystub and 2023 W-2 from Navarro College

**5.** Plaintiff's resume

**6.** Letter from TCU stating Plaintiff's salary starting June 1, 2023.

**7.** Plaintiff's Declaration

**8.** FMLA Statute

**III.**

**BACKGROUND FACTS**

3.01 The following facts are supported by the Declaration of Plaintiff attached as **Exhibit 7**, PApp 24-30 hereto:

3.02 Plaintiff began her career with Texas Christian University on July 15, 2002, as an Admissions Coordinator to oversee the admissions program along with the Microsoft testing (MOUS), hourly at 36 hours per week with a compensation of $28,000 annually. The position was brand new, which was due to the calculation of business students that would apply in the upcoming year. Because there were more than 300 plus students wanting to apply to the business school, TCU implemented an admissions program. Plaintiff's direct supervisor was Randy Lewis who gave Plaintiff the autonomy to run the program without supervision. The duties included, but were not limited to, processing applications, preparing and sending letters, working with alumni to be a part of Interview Day, proctoring the MOUS exams and maintaining the budget.

3.03 As time went on, Plaintiff transitioned into a new role within Student Affairs. Here, Plaintiff served as the Administrative Assistant for the Assistant Vice Chancellor of Student Affairs, Dr. Darron Turner. Dr. Turner's mentorship and guidance became instrumental in Plaintiff's professional growth, and she flourished under his leadership. Dr. Turner was a firm believer in enhancing his employees' skills and abilities, therefore allowing them to participate in training opportunities.

3.04 During Plaintiff's tenure within Student Affairs, she began to take on new challenges and responsibilities while still reporting to Dr. Turner. Plaintiff moved from the Administrative Assistant into the Executive Assistant role. This role gave Plaintiff more budget responsibilities and allowed Plaintiff to become more familiar with Board of Director reports, Title

IX reports, SACS reports and the creation of policies and procedures of the office. As Dr. Turner's responsibilities increased working with EEO and Affirmative Action, so did Plaintiff's responsibilities. These responsibilities moved Plaintiff from the job of Executive Assistant to the role of EEO/AA Program Specialist. While there was not a monetary increase outside of the 3%, in this role Plaintiff had the opportunity to increase her knowledge in fair processing in hiring practices across the university for faculty and staff.

3.05 In 2011, the federal law produced the Dear Colleague Letter, which caused major changes to federal contractors. Dr. Turner became the Title IX Coordinator in addition to his role as the Assistant Vice Chancellor of Student Affairs. These changes afforded Plaintiff the opportunity to move from the EEO/AA Program Specialist role to the Title IX and Compliance Specialist. Again, Plaintiff did not get a monetary increase, just a title change; but the experience was a great reward. This role came with a plethora of duties, such as prevision of policy, investigation Title VI and Title VII cases, training university faculty and staff on Title IX policies and procedures, just to name a few. Plaintiff's commitment to the work and the university never wavered, and she became an indispensable member of the team despite the lawsuits, demand letters and other issues that came with the positions. Due to the demand of Title IX and the caseload, in 2018 the office moved under the Chancellors umbrella with a new team, promotion and title changes. These changes consisted of Dr. Turner, Title IX Coordinator and Senior Advisor to the Chancellor, Plaintiff, Leigh Holland Title IX Investigator, Andrea McDew, Deputy Title IX Investigator, Cheryl Taylor, Title IX and Compliance Specialist, Aisha Torrey-Sawyer, Director of Diversity and Inclusion and Sharon Gooding, Coordinator of Diversity and Inclusion.

3.06 In 2020, Dr. Turner and Plaintiff along with several other university members were named in a discrimination lawsuit. Due to the stress of the lawsuit, in August of 2020, Dr. Turner

retired, which caused a restructuring of the office, name change, and the appointment of a new director. Under the new name, Office of Institutional Equity (OIE), it inherited Title VI and Title VII from Human Resources while still serving all Title IX cases for Faculty, Staff and Students.

3.07 Under this new structure, Sharon Gooding became the Director of the Office of Institutional Equity. Andrea McDew assumed the role of Title IX Coordinator and became Plaintiff's direct supervisor. Cheryl Taylor had a dual role of Title IX and compliance Specialist and Investigator to further develop her skills, but over time she could not handle both roles and the Investigator role and title was changed to Civil Rights and Title IX Case Manager. Within OIE, Plaintiff's title was changed to OIE Investigator with no additional monetary increase. Just as a side note, Plaintiff trained Andrea McDew (Plaintiff's direct supervisor) and Cheryl Taylor (Case manager) on the processes and procedures of the office before the reorganization.

3.08 The cases were minimal before the restructuring of the OIE office. Once the change, they began to see a case increase due to the shifting of Title VI and Title VII complaints to the OIE office. From August 2020 to March 2021, Plaintiff was the only named investigator in the office. Andrea, Sharon and Cheryl would investigate some cases, but by title and job description, Plaintiff was the only one. In mid-April of 2021, a new hire came aboard Teri Green as an investigator. Until Teri finished training and learning the Title IX regulations, Plaintiff's assigned caseload remained heavy.

3.09 Jane Doe discrimination case, which Plaintiff investigated and completed in 12/2019, became a lawsuit that Plaintiff was named in. This suit started out with one person and multiplied into 5 Jane Doe's. This suit lingered into 2021. As Plaintiff gathered material, spoke to lawyers, prepared for possible depositions, Plaintiff continued to work on other complicated cases. (Note, TCU settled this case)

3.10 In July of 2021, an investigation of wrongful termination was on Plaintiff's docket and Plaintiff had to interview high up administrators while maintaining her composure of wrongful actions, such as harsh emails and phone calls from the respondents, who were Plaintiff's colleagues at the time. (Note, TCU settled this case also)

3.11 December 2021 another discrimination case landed on Plaintiff's docket. This case was particularly difficult for Plaintiff as an African American woman, considering the historical context of slavery and cotton picking. Plaintiff had to suppress her feelings of discrimination and listen to numerous justifications for the action of secret Santa gifting a two-foot cotton plant, complete with roots, moss, and dirt, from a Caucasian colleague to an African American colleague. Plaintiff also had to hold several meetings with Human Resource staff, who were Caucasian, to put the respondent on administrative leave in support of the African American woman who worked in the same space as the respondent. This case became a significant strain on Plaintiff's mental health, especially with the traumatic comments and questions from the administration, such as questioning if the gift really caused harm, whether the respondent should only receive a warning, versus termination and the impact of dissemination of work to the African American colleague if the respondent was on leave. These responses felt like attempts to justify the actions of the white colleague, adding to the emotional burden of the situation.

3.12 After the completion of this case in April 2022, Plaintiff had to have surgery on her wrist, which she put off because she was in the middle of this investigation. Plaintiff's surgery and first FMLA leave was in May 2022. While on FMLA, Plaintiff began to see her therapist to help her with the depression and mental trauma. Plaintiff returned to work in July of 2022.

3.13 August 2022 another case Plaintiff investigated (discrimination based on gender) became a lawsuit. Although Plaintiff was not named in this one, Plaintiff played an intricate part

in gathering information and speaking to outside counsel about Plaintiff's investigation process, information Plaintiff collected, and any biases Plaintiff may or may not have. Plaintiff was still going to therapy while trying to maintain her workload of mentally debilitating cases with no form of outlet or detoxing of information. (TCU settled this case as well).

3.14 In December 2022, a former student who used to visit Plaintiff's old office sent a demand letter to the Chancellor of the University and copied Plaintiff. The nature of the email was concerning enough that TCU police stationed an armed officer at the front door of the building to protect the Chancellor. Given Plaintiff's history with this student and Plaintiff's involvement in his discrimination complaint, Plaintiff became worried about her safety. Plaintiff raised her concerns with Sharon Gooding, the Director of OIE, but unfortunately, no action was taken. Plaintiff requested an officer for her end of the building, but the Chancellor's stance was firm: "we do not lock building doors", and no additional officer was assigned. The statement in the letter "May God have mercy on TCU" left Plaintiff traumatized and led Plaintiff to continue therapy sessions for a confidential outlet. Over the Christmas break, the student vandalized the building, prompting the SWAT team, bomb squad, and local police to arrive and eventually detain him.

3.15 In January 2023 after arriving back from the holiday break, the first case on Plaintiff's docket was a case of sexual assault where the complainant lured the respondent in the basement and threatened to kill him with a hatchet. This case was intense and facilitated multiple reports, interviews, social media documents and Plaintiff's accessibility to the complainant, her witness and the respondent.

3.16 Plaintiff spoke to Sharon Gooding on February 16, 2023, about her mental state and informed Ms. Gooding that she would be seeing her therapist on Friday. She stated, "Do what you need do to for your self-care." Plaintiff expressed the influx of cases and the impossibility to take

time off; she again said, "We have to take care of ourselves, and I am here for you if you need anything."

3.17 On Friday, February 17, 2023, Plaintiff met virtually with her therapist and Plaintiff broke down in her session. He advised Plaintiff to take the rest of the day off and provided Plaintiff with a doctor's note to give to her supervisor. Andrea McDew was still on maternity leave so Plaintiff slid the note under Sharon Gooding's door and left for the day.

3.18 On February 20, 2023, Plaintiff met with her therapist again and he advised Plaintiff to take some extended time off to get her mental health under control.

3.19 On February 17, 2023, Plaintiff was officially on FMLA through May 1, 2023. See **Exhibit 1**, PApp 3-10. Upon Plaintiff's return she was directed by Joan Fralia (Yohana Chambers assistant), to meet in Human Resources at 9am. When Plaintiff got there, she became aware that this meeting was a separation meeting. At the time of Plaintiff's termination her compensation was $82,751 annually.

## IV.

## LEGAL STANDARD

4.01 The Court must grant summary judgment when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which movant believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet its burden by identifying elements of a plaintiff's claims that are not supported by any evidence. *Id.* The burden then shifts to the non-moving party to establish the existence of a genuine

issue for trial, which requires "more than simply showing that there is some metaphysical doubt as to the material facts . . ." *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987).

## V.

## ARGUMENT AND AUTHORITIES

### A. Legal Authorities.

5.01 Plaintiff was an eligible employee under the FMLA. Plaintiff had worked for Defendant for at least twelve (12) months and had worked at least 1,250 hours during the twelve (12) months prior to taking the leave.

5.02 Defendant was subject to the provisions of the FMLA. Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site for twenty (20) or more work weeks in the prior or current calendar year.

5.03 Plaintiff suffered from one or more "serious health conditions" as defined by the FMLA. 29 U.S.C. 2611 (11), arising out of Plaintiff's investigative work for Defendant.

5.04 Defendant interfered with Plaintiff in the exercise of her FMLA rights by assigning Plaintiff work while she was on FMLA leave (**Exhibit 2**, PApp 11-13) and terminating her employment while Plaintiff still had FMLA leave available. **Exhibit 3**, PApp 14-15. Plaintiff made good faith efforts to submit all necessary medical certifications for her FMLA leave.

5.05 The FMLA's interference provision makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," any substantive FMLA right. 29 U.S.C. § 2615(a)(1); *see also Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Notably, a claim that an employee was terminated for taking FMLA leave is cognizable under *both* an interference

or prescriptive claim under 29 U.S.C. §2615(a)(1), or under a retaliation or proscriptive claim under §2615(2). *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 n.2 (6th Cir. Ohio 2007).

5.06 As a result of her wrongful termination, Plaintiff has suffered damages in the form of lost wages and benefits. Plaintiff is entitled to back pay, plus interest on that amount, and front pay to compensate her for that loss. 29 U.S.C § 2617(a)(1)(A)(i)-(ii).

5.07 The aforementioned acts were and are a willful violation of the FMLA and entitle Plaintiff to recover damages as provided by 29 U.S.C. 2617, including liquidated damages. Plaintiff further seeks reinstatement to her position or a comparable position with reinstatement of benefits and seniority time.

5.08 As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief. 29 U.S.C § 2617(a)(3).

**B. Defendant's FMLA Acts of Discrimination, Interference and Retaliation.**

5.09 Section 105 of the FMLA and section 825.220 of the FMLA regulations prohibit the following actions:

- An employer is prohibited from interfering with, restraining, or denying the exercise of, or the attempt to exercise, any FMLA right.
- An employer is prohibited from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise any FMLA right.
- An employer is prohibited from discharging or in any other way discriminating against any person, whether or not an employee, for opposing or complaining about any unlawful practice under the FMLA.
- All persons, whether or not employers, are prohibited from discharging or in any other

way discriminating against any person, whether or not an employee, because that person has —

- Filed any charge, has instituted, or caused to be instituted, any proceeding under or related to the FMLA;
- Given, or is about to give, any information in connection with an inquiry or proceeding relating to any right under the FMLA; or
- Testified, or is about to testify, in any inquiry or proceeding relating to a right under the FMLA.

Examples of prohibited conduct include:

- Refusing to authorize FMLA leave for an eligible employee,
- Discouraging an employee from using FMLA leave,
- Manipulating an employee's work hours to avoid responsibilities under the FMLA,
- Using an employee's request for or use of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions, or,
- Counting FMLA leave under "no fault" attendance policies.

5.10 Any violations of the FMLA or the Department's regulations constitute interfering with, restraining, or denying the exercise of rights provided by the FMLA.

**C. FMLA Violations Timeline and Argument.**

5.11 Defendant's FMLA violations are clear from the following timeline based on the **Exhibit C** exhibits.

| **Date** | **Event** |
|---|---|
| July 15, 2002 | Plaintiff is employed by Defendant as an Admissions Coordinator. Plaintiff was a 21 year employee when she was fired by Defendant. |

| | |
|---|---|
| 2011 | Plaintiff moved from EEO-AA Program Specialist to Title IX and Compliance Specialist |
| 2020 | Plaintiff's title changed to Office of Institutional Equity (OIE) Investigator. |
| 2023 | On February 17, 2023, Plaintiff met virtually with her therapist as a result of a sexual assault case she investigated and went on FMLA leave on February 21, 2023. Plaintiff continued to be assigned work while on FMLA leave. See **Exhibit 2**, PApp 11-13. |
| May 2, 2023 | Plaintiff returned from FMLA leave and was fired while still having unused FMLA leave. |

5.12 Plaintiff submits that the documentary record in this case conclusively establishes Defendant's violations of the FMLA, resulting in strict liability.

**D. Plaintiff's Damages.**

5.13 At the time of Plaintiff's termination on May 2, 2023, her annual salary was $82,751. Her lost backpay of $6,896 per month for 30 months, yields a total of $206,880.

Plaintiff started a new job on February 1, 2024, making an annual salary of $63,000 ($5,250/mo.). 10 mos x $5,250= $52,500. Subtracting $52,500 from $206,880 = $154,380. Plaintiff worked a portion of 2023 at Navarro College with a total compensation of $2,719. Subtracting $2,719 from $154,380 = a lost back pay of $151,661.

Plaintiff's lost front pay is $82,751 - $63,000 = $19,751 x 5 = $98,755.

Therefore, Plaintiff's damages are as follows:

| | |
|---|---|
| Lost Back Pay | $154,380 |
| Front Pay | $ 98,755 |
| Liquidated Damages | $253,135 |
| Legal Fees | $ 15,000 |
| Total Damages | $268,135 |

Liquidated Damages $253,135

| | |
|---|---|
| Total Damages | |
| Lost Earnings | $253,135 |
| Liquidated Damages | $253,135 |
| | |
| Total Damages | $506,270 |

## VI.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**,

6.01 Plaintiff respectfully prays that this Court grant her Motion for Summary Judgment, and for such other and further relief, both general or special, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: W. D. Masterson

**W. D. MASTERSON**
State Bar No. 13184000
3141 Hood Street, Suite 500
Dallas, Texas 75219
214-969-9099 - Telephone
214-953-0133 – Facsimile
wdm@kilgorelaw.com

**ATTORNEY FOR PLAINTIFF**
**LEIGH HOLLAND**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing document has been served on Defendant's counsel of record via E-File and/or email, on this 19th day of December 2024:

Eva W. Turner
OGLETREE, DEAKINS
8117 Preston Road, Suite 500
Dallas, TX 75225
eva.turner@ogletree.com

Molly Ann Lawrence
OGLETREE, DEAKINS
8117 Preston Road, Suite 500
Dallas, TX 75225
mollyann.lawrence@ogletree.com

*W. D. Masterson*
W. D. Masterson