PLAINTIFF'S EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **LEIGH HOLLAND** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY** | § | **CIVIL ACTION NO.: 4:24-cv-00289-O** |
| | § | |
| | § | |
| ***Defendant.*** | § | |

# DECLARATION OF LEIGH HOLLAND

1. My name is Leigh Holland. I am over the age of 21 years, have personal knowledge of the facts stated herein, and am competent to testify to same. The facts stated herein are true and correct.

2. I began my career with Texas Christian University on July 15, 2002, as an Admissions Coordinator to oversee the admissions program along with the Microsoft testing (MOUS), hourly at 36 hours per week with a compensation of $28,000 annually. The position was brand new, which was due to the calculation of business students that would apply in the upcoming year. Because there were more than 300 plus students wanting to apply to the business school, TCU implemented an admissions program. My direct supervisor was Randy Lewis who gave me the autonomy to run the program without supervision. The duties included, but were not limited to, processing applications, preparing and sending letters, working with alumni to be a part of Interview Day, proctoring the MOUS exams and maintaining the budget.

3. As time went on, I transitioned into a new role within Student Affairs. Here, I served as the Administrative Assistant for the Assistant Vice Chancellor of Student Affairs, Dr. Darron

Turner. Dr. Turner's mentorship and guidance became instrumental in my professional growth, and I flourished under his leadership. Dr. Turner was a firm believer in enhancing his employees' skills and abilities, therefore allowing them to participate in training opportunities.

4. During my tenure within Student Affairs, I began to take on new challenges and responsibilities while still reporting to Dr. Turner. I moved from the Administrative Assistant into the Executive Assistant role. This role gave me more budget responsibilities and allowed me to become more familiar with Board of Director reports, Title IX reports, SACS reports and the creation of policies and procedures of the office. As Dr. Turner's responsibilities increased working with EEO and Affirmative Action, so did my responsibilities. These responsibilities moved me from the job of Executive Assistant to the role of EEO/AA Program Specialist. While there was not a monetary increase outside of the 3%, in this role I had the opportunity to increase my knowledge in fair processing in hiring practices across the university for faculty and staff.

5. In 2011, the federal law produced the Dear Colleague Letter, which caused major changes to federal contractors. Dr. Turner became the Title IX Coordinator in addition to his role as the Assistant Vice Chancellor of Student Affairs. These changes afforded me the opportunity to move from the EEO/AA Program Specialist role to the Title IX and Compliance Specialist. Again, I did not get a monetary increase, just a title change; but the experience was a great reward. This role came with a plethora of duties, such as prevision of policy, investigation Title VI and Title VII cases, training university faculty and staff on Title IX policies and procedures, just to name a few. My commitment to the work and the university never wavered, and I became an indispensable member of the team despite the lawsuits, demand letters and other issues that came with the positions. Due to the demand of Title IX and the caseload, in 2018 the office moved under the Chancellors umbrella with a new team, promotion and title changes. These changes consisted of

Dr. Turner, Title IX Coordinator and Senior Advisor to the Chancellor, myself, Title IX Investigator, Andrea McDew, Deputy Title IX Investigator, Cheryl Taylor, Title IX and Compliance Specialist, Aisha Torrey-Sawyer, Director of Diversity and Inclusion and Sharon Gooding, Coordinator of Diversity and Inclusion.

6. In 2020, Dr. Turner and I, along with several other university members were named in a discrimination lawsuit. Due to the stress of the lawsuit, in August of 2020, Dr. Turner retired, which caused a restructuring of the office, name change, and the appointment of a new director. Under the new name, Office of Institutional Equity (OIE), it inherited Title VI and Title VII from Human Resources while still serving all Title IX cases for Faculty, Staff and Students.

7. Under this new structure, Sharon Gooding became the Director of the Office of Institutional Equity. Andrea McDew assumed the role of Title IX Coordinator and became my direct supervisor. Cheryl Taylor had a dual role of Title IX and compliance Specialist and Investigator to further develop her skills, but over time she could not handle both roles and the Investigator role and title were changed to Civil Rights and Title IX Case Manager. Within OIE, my title was changed to OIE Investigator with no additional monetary increase. Just as a side note, I trained Andrea McDew (my direct supervisor) and Cheryl Taylor (Case manager) on the processes and procedures of the office before the reorganization.

8. The cases were minimal before the restructuring of the OIE office. Once the change, we began to see a case increase due to the shifting of Title VI and Title VII complaints to the OIE office. From August 2020 to March 2021, I was the only named investigator in the office. Andrea, Sharon and Cheryl would investigate some cases, but by title and job description, I was the only one. In mid-April of 2021, a new hire came aboard Teri Green as an investigator. Until Teri finished training and learning the Title IX regulations, my assigned caseload remained heavy.

**Investigations**

9. The Jane Doe discrimination case, which I investigated and completed in 12/2019, became a lawsuit that I was named in. This suit started out with one person and multiplied into 5 Jane Doe's. This suit lingered into 2021. As I gathered material, spoke to lawyers, prepared for possible depositions, I continued to work on other complicated cases. (Note, TCU settled this case)

10. In July of 2021, an investigation of wrongful termination was on my docket and I had to interview high up administrators while maintaining my composure of wrongful actions, such as harsh emails and phone calls from the respondents, who were my colleagues at the time. (Note, TCU settled this case also)

11. December 2021 another discrimination case landed on my docket. This case was particularly difficult for me as an African American woman, considering the historical context of slavery and cotton picking. I had to suppress my feelings of discrimination and listen to numerous justifications for the action of secret Santa gifting a two-foot cotton plant, complete with roots, moss, and dirt, from a Caucasian colleague to an African American colleague. I also had to hold several meetings with Human Resource staff, who were Caucasian, to put the respondent on administrative leave in support of the African American woman who worked in the same space as the respondent. This case became a significant strain on my mental health, especially with the traumatic comments and questions from the administration, such as questioning if the gift really caused harm, whether the respondent should only receive a warning, versus termination, and the impact of dissemination of work to the African American colleague if the respondent was on leave. These responses felt like attempts to justify the actions of the white colleague, adding to the emotional burden of the situation.

12. After the completion of this case in April 2022, I had to have surgery on my wrist,

which I put off because I was in the middle of this investigation. My surgery and first FMLA leave was in May 2022. While on FMLA, I began to see my therapist to help me with the depression and mental trauma. I returned to work in July of 2022.

13. August 2022 another case I investigated (discrimination based on gender) became a lawsuit. Although I was not named in this one, I played an intricate part in gathering information and speaking to outside counsel about my investigation process, information I collected, and any biases I may or may not have. I was still going to therapy while trying to maintain my workload of mentally debilitating cases with no form of outlet or detoxing of information. (TCU settled this case as well).

14. In December 2022, a former student who used to visit my old office sent a demand letter to the Chancellor of the University and copied me. The nature of the email was concerning enough that TCU police stationed an armed officer at the front door of the building to protect the Chancellor. Given my history with this student and my involvement in his discrimination complaint, I became worried about my safety. I raised my concerns with Sharon Gooding, the Director of OIE, but unfortunately, no action was taken. I requested an officer for my end of the building, but the Chancellor's stance was firm: “we do not lock building doors”, and no additional officer was assigned. The statement in the letter “May God have mercy on TCU” left me traumatized and led me to continue therapy sessions for a confidential outlet. Over the Christmas break, the student vandalized the building, prompting the SWAT team, bomb squad, and local police to arrive and eventually detain him.

15. In January 2023 after arriving back from the holiday break, the first case on my docket was a case of sexual assault where the complainant lured the respondent in the basement and threatened to kill him with a hatchet. This case was intense and facilitated multiple reports,

interviews, social media documents and my accessibility to the complainant, her witness and the respondent.

16. I spoke to Sharon Gooding on February 16, 2023, about my mental state and informed Ms. Gooding that I would be seeing my therapist on Friday. She stated, "Do what you need do to for your self-care." I mentioned the influx of cases and the impossibility to take time off; she again said, "We have to take care of ourselves, and I am here for you if you need anything."

17. On Friday, February 17, 2023, I met virtually with my therapist, and I broke down in my session. He advised me to take the rest of the day off and provided me with a doctor's note to give to my supervisor. Andrea McDew was still on maternity leave, so I slid the note under Sharon Gooding's door and left for the day.

18. On February 20, 2023, I met with my therapist again and he advised me to take some extended time off to get my mental health under control.

19. On February 17, 2023, I was officially on FMLA through May 2, 2023. Upon my return I was directed by Joan Fralia (Yohana Chambers assistant), to meet in Human Resources at 9am. When I got there, I became aware that this meeting was a separation meeting. At the time of my termination my compensation was $82,751 annually.

20. All of the documents included in Plaintiff's Motion for Summary Judgment are true and correct copies of the original documents.

21. I have reviewed the calculation of my damages in Section VD of the Plaintiff's Motion for Summary Judgment filed in this case and the facts set forth in such section are true and correct.

22. My name is Leigh Holland. My date of birth is 03011967 and my address is 701 Liska Rd, Ennis, Texas 75119, USA.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed in Dallas County, State of Texas, on December 18, 2024.

Leigh Holland